UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------x

                                          NOT FOR PUBLICATION
BISHNU S. BAIJU,                          **MEMORANDUM AND ORDER**

                    Petitioner,           12-cv-5610 (KAM)

          -against-

UNITED STATES DEPARTMENT OF LABOR, and
FIFTH AVENUE COMMITTEE, INC.,

                    Respondents.



------------------------------------------x

**MATSUMOTO, United States District Judge:**

          *Pro se* petitioner Bishnu S. Baiju ("petitioner" or

"Baiju") seeks judicial review and reversal of the final

Decision and Order of the Department of Labor Administrative

Review Board ("ARB") dated March 30, 2012, and the ARB's denial

of reconsideration dated May 31, 2012.[1]  This court has judicial

review of final agency actions pursuant to the Administrative

Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.  *See* 5 U.S.C. §§

702, 704.

---

[1]      Petitioner initially filed his petition for review in the Second
Circuit. (*See* ECF No. 1, Pet. for Review ("Pet") dated 6/18/12.)  On November
5, 2012, the petition was transferred to this court pursuant to 28 U.S.C. §
1631.  (ECF No. 3, Mandate of Transfer.)  On December 5, 2012, the Honorable
Lois Bloom deemed the petition for review filed with the Second Circuit to
constitute petitioner's complaint in this court.  (*See* ECF No. 10, Order
dated 12/5/12.)  The court will thus treat the petition for review (ECF No.
1) as the operative complaint, but notes petitioner's later-filed "Brief" and
"Appendix," both dated December 10, 2012.  (*See* ECF Nos. 16 and 17.)

Pending before the court are respondent Department of Labor's motion for summary judgment to affirm the ARB's final decision and petitioner's motion seeking certification of Form I-918 for his application for a U-Visa. Additionally, respondent Fifth Avenue Committee, Inc. ("FAC") moves for summary judgment to affirm the ARB decision and petitioner moves for summary judgment to reverse the ARB decision.[2]

For the reasons set forth below, the court: (1) grants summary judgment as to respondents Department of Labor and FAC; (2) denies petitioner's summary judgment motion; (3) denies

---

[2]     Pursuant to Local Civil Rule 56.2 ("Rule 56.2"), any represented party moving for summary judgment against a *pro se* party "shall serve and file as a separate document, together with the papers in support of the motion, [a] 'Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment.'" Failing to provide a *pro se* plaintiff with notice of the consequences of failing to respond to a motion for summary judgment is a ground for reversal. *See Vital v. Interfaith Medical Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999). Here, defendant Department did not provide notice as required by Rule 56.2. (*See* ECF No. 66, Dep't of Labor Mot. for Summ. J. filed 7/26/13.) Defendant FAC, however, fully complied with Rule 56.2. (*See* ECF No. 74, FAC Mot. for Summ. J. filed 8/12/13, Ex. 1, Notice to *Pro Se* Litigant Who Opposes a Motion for Summary Judgment.) In addition, it is evident from petitioner's own motion for summary judgment, his opposition papers, and the numerous citations he has made to the administrative record, that petitioner fully understood the consequences of failing to respond to the Department's and FAC's respective motions and that he was required to deny factual allegations and cite to the record in support of those denials.
        Under these circumstances, the court finds that petitioner received sufficient notice of the consequences and requirements of summary judgment, and accordingly, the Department of Labor's failure to comply with Rule 56.2 is excused. *Covello v. Depository Trust Co.*, 212 F. Supp. 2d 109, 116 (E.D.N.Y. 2002) (excusing one defendant's failure to provide Rule 56.2 notice where other defendant provided notice and plaintiff's opposition papers showed she understood her obligation to deny factual obligations and cite to the record); *Sawyer v. Am. Fed. Of Gov't Employees, AFL-CIO*, 180 F.3d 31, 34-35 (2d Cir. 1999)("[T]he record here shows that [plaintiff] knew that he was required to produce evidence supporting the issues of material fact that he needed to preserve for trial. This showing is all that is required. Ultimately, [plaintiff's] opposition to the summary judgment motion fail[s] not because he inadequately disputed key facts, but because his position on the merits was legally insufficient.").

petitioner's petition for review and affirms the final decision of the ARB; and (4) denies petitioner's motion for certification for his U-Visa application.

**BACKGROUND**

**I.   Facts**

The following facts are taken from the Department of Labor's Local Civil Rule 56.1 Statement ("Resp't 56.1 Stmt.") and the administrative record ("R.").[3]

**A.   Petitioner's H-1B Visa and Employment**

Petitioner Baiju was employed as a staff accountant by respondent Fifth Avenue Committee, Inc. ("FAC") from November 8, 2005 to February 7, 2008.  (ECF No. 66, Ex. 1, Resp't 56.1 Stmt. dated 6/20/13 ¶ 1.)  FAC is a 501(c)(3) corporation, and Michelle de la Uz ("de la Uz") serves as its executive director. (*Id.*)  Brooklyn Workforce Innovations ("BWI"), also known as

---

[3]    Local Civil Rule 56.1(a) mandates that "[u]pon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Under Local Civil Rule 56.1(b), "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."

Petitioner disputes the entirety of the Department's Rule 56.1 Statement and FAC's 56.1 Statement.  After reviewing petitioner's counter-Rule 56.1 Statements submitted in opposition to the Department's and FAC's Statements and in petitioner's own motion for summary judgment, the court notes that the large majority of petitioner's "facts" are not adequately supported by the administrative record, make legal conclusions or arguments, or are immaterial disputes.  In addition, FAC's 56.1 Statement substantially reiterates the facts set forth in the Department's 56.1 Statement, and is supported by references to the record.  Therefore, for purposes of brevity and clarity, the court relies mainly on the Department's Rule 56.1 Statement, noting material and substantiated disputes where relevant.

Leap, Inc., is a separate 501(c)(3) entity that is a wholly controlled affiliate of FAC.  (ECF No. 68, Resp't Opp. Stmt. Dated 7/25/12 ¶ 1.)  In his role as staff accountant at FAC, petitioner's responsibilities included performing work for FAC and BWI.  (*Id.* ¶ 15.)  Although petitioner was originally hired on a temporary basis to perform the duties of the former staff accountant who had been called to active duty overseas, FAC sought to retain petitioner on a full-time basis after the former employee returned to the United States and resigned her position.  (R. at 5, 174-75.)

In connection with its offer of full-time employment, in September 2006, FAC filed a Labor Condition Application ("LCA") for an H-1B temporary work visa on behalf of petitioner to cover the period from September 25, 2006 to September 24, 2009.  (Resp't 56.1 Stmt. ¶ 1.)  The H-1B visa program allows employers to employ nonimmigrants in "specialty occupations" on a temporary basis.  *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). Pursuant to 20 C.F.R. § 655.731(a), an employer seeking to employ an H-1B nonimmigrant must state that it will pay the H-1B nonimmigrant the required wage rate under the regulations, which is defined as "the greater of the actual wage rate . . . or  the prevailing wage."  20 C.F.R. § 655.731(a).  The actual wage is the wage rate paid by the employer to all other individuals with similar experience and qualifications for the particular

4

employment position.  20 C.F.R. § 655.731(a)(1).  The prevailing
wage rate is determined by one of three sources: an Office of
Foreign Labor Certification National Processing Center
determination, an independent authoritative source, or
"[a]nother legitimate source of wage information."  20 C.F.R. §
655.731(a)(2)(ii).[4]

     To obtain the prevailing wage rate for Baiju's H-1B
visa application, FAC relied on its own survey, which included
looking at salary surveys and other documents from peer
institutions as well as the salaries of FAC employees, and
determined that the prevailing wage for petitioner's position
was $45,000 per year. (Resp't 56.1 Stmt. ¶ 4.)  Petitioner
argues that FAC never used a survey to determine the prevailing
H-1B visa wage rate. (ECF No. 67, Ex. 1, Pet'r 56.1 Stmt. dated
7/5/13 ¶ 4.)

     Petitioner earned $45,000 in 2006 when he first began
working under the H-1B visa, and received cost of living
increases in 2006 and 2007.  (R. at 177-78.)  By the time
petitioner's employment with FAC ended in early 2008, he was
earning $50,500 per year.  (Resp't 56.1 Stmt. ¶ 4.)

**B.   Permanent Labor Certification Application**

---

[4]     If an employer relies on some other legitimate source of wage
information to determine the prevailing wage, the other legitimate source
survey "must meet all the criteria set forth in [20 C.F.R. §
655.731(b)(3)(iii)(C)].  The employer will be required to demonstrate the
legitimacy of the wage in the event of an investigation." 20 C.F.R. §
655.731(a)(2)(ii)(C).

In the fall of 2006, FAC applied to the Department of Labor ("Department") for a permanent labor certification on behalf of Baiju that, if granted, would allow FAC to apply for permanent residence status on Baiju's behalf.  (Resp't 56.1 Stmt. ¶ 6); 20 C.F.R. § 656 *et seq*.  As part of the permanent labor certification process, the sponsoring employer must certify various conditions of employment on the Application for Permanent Employment Certification (ETA Form 9089), including that the "offered wage equals or exceeds the prevailing wage determined pursuant to [20 C.F.R.] § 656.40," and that the offered wage "is applicable at the time the alien begins work or from the time the alien is admitted to take up the certified employment."  20 C.F.R. §§ 656.10(c)(1), 656.17.  The employer seeking permanent labor certification for a nonimmigrant employee must request a prevailing wage determination from the state workforce agency ("SWA"); it cannot rely on any other sources of wage information.  *See* 20 C.F.R. § 656.40.

Accordingly, in connection with FAC's application for permanent labor certification for Baiju, FAC requested a prevailing wage determination from the New York SWA, and on November 9, 2006, the SWA provided a wage determination for petitioner of $34.89 per hour, or $72,571 per year.[5]  (Resp't

---

[5]     Petitioner uses the figure $63,500 per year throughout the agency proceedings and before the court, which is the amount petitioner calculated

56.1 Stmt. ¶ 8.)  FAC requested a second wage determination, and
on January 11, 2007, the SWA provided the same wage rate.  (*Id.*)
On November 8, 2007, FAC was advised by Satish Bhatia, the
immigration attorney who had assisted FAC with petitioner's H-1B
visa application process, that FAC was not required to pay the
SWA-determined wage rate until the permanent labor certification
application was approved.  (*Id.* ¶ 9.)  FAC provided petitioner
with a copy of the correspondence with Bhatia and a copy of the
wage determination from the SWA.  (*Id.* ¶ 10.)  The Department of
Labor never granted permanent employment certification for
petitioner during his time of employment with FAC. (*Id.* ¶ 11.)

### C.   Petitioner's Complaints Regarding Wage Rate

Despite not having been granted permanent employment
certification, petitioner repeatedly insisted that he was
entitled to the higher wage rate set by the SWA, instead of the
wage he was being paid under his H-1B visa.  (*Id.* ¶¶ 11-12; R.
at 202-03, 275-77.)  According to de la Uz, petitioner was
"disturbing the work of other people, he was raising his voice,
[and] he was stopping a board member in the hallway" when the
board member came by the FAC offices.  (R. at 202.)  Other FAC
staff members told de la Uz about petitioner's "disruptive" and
"aggressive" behavior.  (R. at 203.)  Petitioner himself
acknowledged that "[t]ime and again, I . . . talked to the

---

based on the SWA-determined hourly rate of $34.89, multiplied by the
estimated number of hours he worked per year.  (*See* R. at 115-16, 428.)

finance director and also to [de la Uz] and also to other staff"
regarding his salary. (R. at. 160.)

On February 6, 2008, petitioner sent an email to de la
Uz, asking, "When do you start paying me DOL DETERMINED RATE OF
PAY?"[6] (R. at 275.) In her response, de la Uz explained that
the SWA-determined wage rate would only apply once the permanent
employment certification was granted. (R. at 277.) In
addition, de la Uz advised petitioner that sending emails
demanding a pay raise was inappropriate, and that he should
schedule a meeting with his supervisor to professionally discuss
any reasons that he believed justified a raise.[7] (*Id.*) De la Uz
also noted that FAC "does not currently have a staff accountant
position that pays $63k on an annual basis nor do I believe that
we will . . . in the near future. If you believe you should be
paid that amount, and that level of pay is critical to you, you
should seek employment that pays that amount outside of FAC."[8]
(*Id.*)

---

[6]    Petitioner's requests for a higher salary appear to also be related to
his belief that he was taking on extra duties by performing work for FAC's
wholly owned affiliates in addition to the work for FAC. (*See* R. at 275 ("I
HAVE BEEN PROVIDING SERVICE TO LEAP INC. FOR LAST TWO YEARS AND TO BROOKLYN
WOODS SINCE JANUARY 2007."))
[7]    Specifically, de la Uz wrote: "You need to take a step back and act
rationally and professionally.  Sending emails to me demanding a pay raise
citing the DOL, is absolutely inappropriate.  I suggest you schedule a
meeting with your supervisor to calmly and professionally talk through why
you believe you deserve a raise, knowing that the DOL determination of future
salary is not a reason." (R. at 277.)
[8]    In his Rule 56.1 Statement, petitioner takes excerpts from de la Uz's
email response and construes the email as a threat: "Ms de la Uz threatened
to leave the job [sic] if I require DOL rate of salary . . . . This is

The next day, on February 7, 2008, de la Uz met with Baiju to discuss his refusal to perform his work duties and his wage demands. (R. at 203.) During the meeting, de la Uz showed petitioner a copy of his job description and asked him if he was unwilling to perform the described duties that he previously had agreed to perform. (*Id.*) Petitioner replied that he was not willing to perform them. (R. at 204.) When de la Uz told petitioner that his unwillingness to perform his job meant that FAC would have to terminate his employment, petitioner replied, "'You don't terminate me. I terminate you.'" (R. at 203-04.)

D. **Termination from Employment**

FAC terminated petitioner's employment on February 7, 2008, and in a letter dated February 12, 2008, FAC informed petitioner that his employment was terminated for unprofessional behavior, including violations of FAC's Code of Conduct. (Resp't 56.1 ¶ 16; R. at 252.) The letter also notified petitioner that FAC would withdraw any outstanding government petitions relating to his employment. (R. at 252.) Petitioner appealed the termination with FAC's Personnel Committee, and on March 11, 2008, the Personnel Committee upheld the termination decision as consistent with FAC's personnel policies. (R. at 252.)

---

trafficking." (Pet'r 56.1 ¶ 14.) After reading the entire email, the court does not agree with petitioner that the email was threatening.

On March 11, 2008, FAC notified United States Customs and Immigration Services ("USCIS"), which had approved petitioner's H-1B visa petition, that FAC had terminated petitioner's employment.  FAC also informed USCIS that because it no longer employed petitioner, it was withdrawing the permanent employment certification application that it had submitted on petitioner's behalf.  (R. at 288.)

**E.   Wage and Hour Investigation**

On June 1, 2008, petitioner filed a complaint with the Office of Inspector General for the Department of Labor, alleging that FAC had committed pay violations by not paying him the appropriate prevailing wage.  (R. at 19.)  On September 16, 2009, the Wage and Hour Division ("WHD") of the Department, after investigation of the complaint, issued a determination letter ruling that FAC had failed to pay petitioner wages in violation of 20 C.F.R. § 655.731.  (R. at 38–39, 280.) Specifically, the WHD found that the survey FAC had used to determine petitioner's prevailing wage rate for his H-1B visa employment failed to conform to criteria specified in 20 C.F.R. § 655.731(b)(3)(iii)(C).  (Resp't 56.1 ¶ 19; R. at 280.)  The WHD requested a wage determination from the Department's Employment and Training Administration ("ETA"), and used the ETA's wage rate to determine the amount of back wages that FAC owed petitioner.  (R. at 280.)  The WHD assessed that FAC owed

petitioner back wages of $377.28 for the period from November 16, 2006 to March 15, 2008, the date that FAC's Personnel Committee upheld the termination decision.  (R. at 38.)

### F.   ALJ Decision

Petitioner appealed the WHD determination to the Department's Office of Administrative Law Judges.  (Resp't 56.1 ¶ 22.)  At the administrative hearing, the Administrative Law Judge ("ALJ") heard testimony from petitioner and de la Uz and entered documents into evidence.  (Resp't 56.1 ¶ 23; R. at 114-73.)

On March 8, 2010, the ALJ issued a Decision and Order affirming the WHD's determination of back wages.  (R. at 422-43.)  Specifically, the ALJ first found that FAC was not obligated to pay petitioner the SWA-determined wage rate for work that petitioner performed under his H-1B visa, because "20 C.F.R. § 656.10(c)(4) provides that an employer is not required to pay the wage determination reported on a PERM [permanent] labor certification until permanent residence is granted."  (R. at 433.)  Second, the ALJ found that the WHD had properly requested a wage determination from the ETA in the course of its investigation into petitioner's complaint.  (R. at 434.)  The ALJ rejected petitioner's argument that the WHD should have instead relied on the SWA wage determination, noting that the SWA wage rate was issued in conjunction with the permanent

11

employment certification application, not for H-1B visa employment.  (R. at 435.)  Third, the ALJ determined that FAC validly effected a bona fide termination on March 11, 2008, and that it therefore did not owe petitioner for back wages after that date.  (R. at 436.)

Lastly, the ALJ determined that FAC did not discriminate or retaliate against petitioner in discharging him shortly after he complained about not being paid the SWA-determined wage rate.[9]  (R. at 439-41.)  The ALJ found that because petitioner was told several times that the SWA wage rate would only apply after the permanent employment certification was granted, it was not reasonable for petitioner to continue believing that he was entitled to the SWA wage rate, and therefore, petitioner did not engage in protected activity.  (R. at 440.)  The ALJ also determined that FAC articulated a legitimate reason for terminating petitioner, namely, that he refused to work and was disruptive in his manner of demanding a pay increase.  (R. at 441.)  The ALJ also found that the evidence failed to show that FAC's given reason for termination was pretextual, as petitioner had previously complained about

---

[9]      Under 8 U.S.C. § 1182(n)(2)(C)(iv) and 20 C.F.R. § 655.801(a), no employer may discriminate against an H-1B employee for complaining internally or externally about suspected violations of H-1B program requirements. During the pendency of a whistleblower retaliation complaint, an H-1B worker may remain in the United States during the term of the H-1B visa and seek other employment, even though the worker is no longer employed by the sponsoring employer.  8 U.S.C. § 1182(n)(2)(C)(v).

his wages and FAC did not take any adverse action against him. (R. at 442.) In addition, the ALJ credited de la Uz's recollection of the events and noted that petitioner's demeanor at the hearing, including his reluctance to follow instructions and accept rulings that were not in his favor, supported de la Uz's testimony about petitioner's behavior prior to his termination. (R. at 441.)

After the ALJ issued the Decision and Order, petitioner filed several motions for reconsideration and attempted to submit additional documents. (R. at 585.) The ALJ denied these requests, finding that no grounds had been set forth for reconsideration. (R. at 586.)

### J.    ARB Decision and Denial of Reconsideration

Petitioner then appealed to the Administrative Review Board ("ARB") of the Department of Labor. On March 30, 2012, the ARB issued its final decision upholding the ALJ's decision, with modification. (R. at 790-91.) First, the ARB found that the evidence of record supported the ALJ's finding that FAC had relied on a survey to determine the prevailing wage rate for petitioner's H-1B employment. (R. at 796.) In addition, the ARB affirmed the ALJ's decision that the WHD properly calculated the back wages owed to petitioner using the ETA-provided wage determination, not the SWA wage rate. (*Id.*) The ARB agreed with the ALJ that the SWA wage determination was issued in

conjunction with the distinct and separate petition for permanent employment certification, and thus it bore no relationship to petitioner's wages under his H-1B visa.  (*Id.*)

Second, the ARB affirmed that the WHD properly used the ETA wage determination to calculate back wages, and that the ARB properly accepted the ETA wage determination as final, as required under federal regulations.  (R. at 797.)

Third, the ARB found that the ALJ properly concluded that FAC complied with all requirements to effect a bona fide termination of petitioner's employment as of March 11, 2008. (R. at 797.)

Fourth, regarding petitioner's retaliation claim, the ARB agreed with the ALJ's factual findings and ultimately concluded that FAC did not retaliate against petitioner in terminating his employment.  (R. at 799-800.)  In contrast to the ALJ, however, the ARB found that Baiju's belief that he was entitled to a higher salary was reasonable, and that he thus engaged in protected activity.  (R. at 799.)  Nevertheless, the ARB still agreed with the ALJ that FAC did not terminate petitioner's employment because he engaged in protected activity.

> While Baiju's complaints about his pay rate
> to FAC and OSHA were protected, his refusal
> to work was not.  Baiju had complained many
> times about his pay rate, and FAC continued
> to employ him and to pursue the permanent

> labor application, which if approved, would
> have required FAC to pay Baiju the demanded
> amount.  FAC was willing to pay this amount
> once the permanent labor application was
> approved.  We affirm the ALJ's decision that
> FAC did not terminate Baiju's employment
> because he engaged in protected activity.

(R. at 800.)

After the ARB affirmed the ALJ's Decision and Order, petitioner filed three motions to consider, which the ARB denied on May 31, 2012.  (Resp't 56.1 ¶ 39; R. at 850.)  The ARB noted that petitioner failed to demonstrate any grounds justifying reconsideration.[10]  (R. at 850.)  In addition, the ARB declined to admit into evidence new documents submitted by petitioner, noting that petitioner failed to show that the evidence was newly discovered and that it was not readily available prior to the closing of the record by the ALJ.  (Resp't 56.1 ¶ 39; R. at 852.)

## II.  Petition for Review

Baiju, proceeding *pro se* and *in forma pauperis*, initially filed his petition for review of the ARB's final decision and order and denial of reconsideration in the Second Circuit.  (*See* ECF No. 1, Pet. for Review ("Pet.") dated 6/28/23

---

[10]     For the ARB to reconsider a decision, the movant must demonstrate "(i) material differences in fact or law from that presented to a court of which the moving party could not have known through reasonable diligence, (ii) new material facts that occurred after the court's decision, (iii) a chance in the law after the court's decision, and (iv) failure to consider a material fact presented to [the] court before its decision."  (R. at 850.)

and filed 11/14/12.)  On November 5, 2012, the petition was
transferred to this court pursuant to 28 U.S.C. § 1631.  (ECF
No. 3, Mandate of Transfer dated 11/5/12.)  On December 5, 2012,
the Honorable Lois Bloom deemed the petition for review filed
with the Second Circuit to constitute petitioner's complaint in
this court.  (ECF No. 10.)

Petitioner requests "complete review of the ARB
decision and reversal of it." (Pet. at 18.)  Though far from a
model of clarity, the petition appears to allege that: (1)
petitioner is entitled to the SWA-determined prevailing wage
rate of $63,500, or $35.89 per hour (*id.* at 10-13); (2) the ARB
improperly denied petitioner's motions for reconsideration (*id.*
at 13-14); (3) FAC retaliated against petitioner by imposing
misconduct charges on him "[a]fter-the-fact" (*id.* at 16-17); and
(4) FAC practiced involuntary servitude in violation of 18
U.S.C. § 1584 by "forcefully" engaging Baiju in the work of
other companies, namely BWI and Leap, Inc., and allegedly
threatening him with physical harm after he asked for the SWA
wage rate (*id.* at 8-9).

On July 26, 2013, respondent Department of Labor and
and petitioner filed motions for summary judgment.  (ECF No. 65,
Pet'r Mot. for Summ. J. filed 7/26/13; ECF No. 66, Resp't Mot.
for Summ. J. filed 7/26/13.)  On August 12, 2013, respondent FAC

filed a motion for summary judgment to affirm the ARB decision. (ECF No. 74, FAC Mot. for Summ. J. filed 8/12/13.)

### III. Motion for U-Visa Certification

Petitioner also seeks certification by this court of Form I-918 Supplement B, to be submitted as part of petitioner's application for a U-Visa.  By way of background, the purpose of conferring U-Visas is "to strengthen the ability of law enforcement agencies to investigate and prosecute [certain crimes], while offering protection to alien crime victims in keeping with the humanitarian interests of the United States." 72 Fed. Reg. 53,014 (Sept. 17, 2007).  An alien who is granted U nonimmigrant status can remain in the United States for up to four years, with possible extensions, and may apply for permanent resident status after three years.  8 U.S.C. §§ 1184(p)(6), 245.24.  Under the Immigration and Nationality Act ("INA"), an alien is eligible for a U-Visa if he has (1) suffered substantial physical or emotional abuse as a result of being a victim of a qualifying criminal activity, (2) possesses credible and reliable information about the qualifying criminal activity, and (3) has been helpful in the investigation or prosecution of the qualifying criminal activity.  8 U.S.C. § 1101(a)(15)(U); 8 C.F.R. § 214.14(b).  A completed Form I-918, Supplement B serves as certification of the nonimmigrant's helpfulness, and must be submitted to USCIS in order for the

17

agency to consider a U-Visa petition.  8 U.S.C. § 214.14(c).  A
law enforcement agency, prosecutor, judge, or other authority
that has responsibility for the detection, investigation,
prosecution, conviction, or sentencing of qualifying criminal
activity may provide certification.  8 U.S.C. § 214.14(c)(2)(i).

On January 7, 2013, Magistrate Judge Bloom denied
petitioner's request for certification, noting that petitioner's
case is a civil matter and that the court was not able to
certify that petitioner "is, has been, or is likely to be
helpful in the investigation or prosecution of any criminal
activity." (ECF No. 24, Order Denying Certification dated
1/7/13 at 3.)  On August 6, 2013, petitioner informed the court
that the Department of Labor declined to provide certification
on July 26, 2013.  (ECF No. 69, Pet'r Ltr. dated 8/6/13.)
Petitioner now requests certification from this court. (ECF No.
45, Pet'r Ltr. dated 3/18/13; ECF No. 79, Pet'r Ltr. dated
10/18/13; ECF No. 81, Pet'r Ltr. dated 10/22/13.)

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate where "there is no
genuine issue as to any material fact." *Miner v. Clinton Cnty.*,
541 F.3d 464, 471 (2d Cir. 2008) (quoting Fed. R. Civ. P.
56(a)).  "A fact is material when it might affect the outcome of
the suit under governing law." *McCarthy v. Dun & Bradstreet*

*Corp.*, 482 F.3d 184, 202 (2d Cir. 2007).  Thus, the court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  When ruling on a summary judgment motion, the district court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

The moving party carries the initial burden of demonstrating an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party then "must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)) (internal quotation marks omitted).  To defeat a summary judgment motion, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

## II.  Judicial Review under the APA

A district court sitting in review of final agency action pursuant to the Administrative Procedure Act ("APA")

shall "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E). *See Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 445-46 (2d Cir. 2013); *Pythagoras Gen. Contracting Corp. v. U.S. Dep't of Labor*, 926 F. Supp. 2d 490, 496 (S.D.N.Y. 2013).

"This deferential standard of review does not permit the Court to substitute its judgment for that of the agency." *Pythagoras*, 926 F. Supp. 2d at 496 (citing *Nat'l Res. Def. Council v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009) (internal quotation marks omitted)). As long as the "agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007). Thus, the test "is primarily one of rationality. If the [agency] based its order on substantial relevant evidence, fairly ascertained, and if it has made no clear error of judgment, this court is not authorized to overturn that order." *Rockland Cnty. v. U.S. Nuclear Regulatory Comm'n*, 709 F.2d 766, 776 (2d Cir. 1983). Under the arbitrary and capricious standard of review, a reviewing court will thus only overturn agency action when the agency "has relied on factors which Congress has not intended it

to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in or the product of agency expertise." *Karpova*, 497 F.3d at 268; *Motor Vehicle Mftrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court may only review the evidence in the administrative record. *Pythagoras*, 926 F. Supp. 2d at 496.

The court reviews the agency's legal conclusions *de novo*. *J. Andrew Lange, Inc. v. F.A.A.*, 208 F.3d 389, 391 (2d Cir. 2000). The agency's fact-findings are reviewed under a substantial evidence standard. 5 U.S.C. § 706(2)(E). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *J. Andrew Lange*, 208 F.3d at 391 (internal quotation marks and citation omitted). Substantial evidence means "more than a mere scintilla but something less than the weight of the evidence, and the substantial evidence standard may be met despite the possibility of drawing two inconsistent conclusions from the evidence." *United States v. Dist. Council of N.Y.C.*, No. 90 Civ 5722, 2012 WL 5236577, at *6 (S.D.N.Y. Oct. 23, 2012); *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (the reviewing court can reject the agency's fact-finding "only if a reasonable fact-finder *would have to conclude otherwise*")

(internal quotation marks and citation omitted) (emphasis
added).  The substantial evidence standard "is notoriously
difficult to overcome on appellate review." *Bath Iron Works
Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003).

When a party seeks judicial review of agency action,
summary judgment is a "proper mechanism for deciding, as a
matter of law, whether an agency action is supported by the
administrative record and consistent with the APA standard of
review." *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C.
2011) (internal quotation marks and citations omitted); *see also
Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012).
Because, however, the district court sits as an appellate
tribunal in such cases, the usual summary judgment standard
under Federal Rule of Civil Procedure 56(c) does not apply.
*UPMC Mercy*, 793 F. Supp. 2d at 67.  Instead, "it is the role of
the agency to resolve factual issues to arrive at a decision
that is supported by the administrative record, [while] the
function of the district court is to determine whether or not as
a matter of law the evidence in the administrative record
permitted the agency to make the decision it did." *Id.*  If the
court determines that an agency decision violated the APA
standard, "the proper course is for the action, findings, and
conclusions to be vacated, then remanded to the agency for
further administrative proceedings consistent with the court's

opinion." *Beach Erectors, Inc. v. U.S. Dep't of Transp.*, No. 10 CV 5741, 2012 WL 3887209, at *8 (E.D.N.Y. Sept. 7, 2012) (internal quotation marks and citation omitted).

## III. ARB's Final Decision is Affirmed

Petitioner Baiju seeks judicial review of the following determinations made by the ARB: (1) the affirmance of the ALJ's wage determination; (2) the determination that FAC did not retaliate against petitioner in terminating his employment; and (3) the denial of petitioner's requests for reconsideration. Petitioner also alleges that FAC practiced involuntary servitude by forcing him to work for three companies, a claim that the ARB did not discuss in its final decision and order.

### A.   Wage Determination

#### 1.   FAC's Survey to Determine H-1B Visa Prevailing Wage Rate

Petitioner first argues, without factual support, that FAC lied about relying on its own survey to determine the prevailing wage rate for the H-1B visa. (Pet. at 7, 10; Pet'r 56.1 Stmt. ¶ 4.)  The ARB agreed with the ALJ that in determining the prevailing wage listed on the LCA in support of petitioner's H-1B visa application, FAC had conducted its own survey. (R. at 796.)  The court finds that there is substantial evidence to support the ARB's determination.  First, FAC wrote "employer's own survey" for the wage source section on the LCA.

23

(R. at 13.)  In addition, de la Uz testified before the ALJ that FAC had relied on its own surveys to determine a wage rate of $45,000.  (R. at 179-80.)   The ALJ found de la Uz to be a credible witness (R. at 441), and the ALJ's credibility assessments are entitled to "great deference." *Pietrunti v. Dir., Office of Worker's Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997).  Third, WHD, in its request to the ETA for a prevailing wage rate, noted that it had determined that FAC's survey failed to conform to regulatory criteria.  (R. at 280.)  Accordingly, the ARB's determination that FAC relied on its own survey to establish the H-1B visa prevailing wage rate is supported by substantial evidence, and was not arbitrary and capricious.

### 2.   Applicable Wage Rate for Back Pay Calculation

Petitioner also argues that he is entitled to back wages under the SWA-determined rate of $34.89 per hour, and that the ARB's affirmance of the ETA back-pay calculation of $377.28 was made in error. (Pet. at 10-13.)  In its decision, the ARB affirmed the ALJ's determination that the WHD had properly contacted the ETA for a wage determination pursuant to H-1B regulations.  (R. at 796 (citing 20 C.F.R. § 655.731(d)(1).)  The ARB also affirmed the ALJ's award of back wages in the amount of $377.28, noting that the WHD properly used the ETA's wage determination to compute back wages, and that the ALJ

24

properly accepted the ETA wage determination as final.  (*Id.* at 796.)  Notably, the ARB agreed with the ALJ's determination that the SWA-determined wage rate "bore no relationship to Baiju's wages under his H-1B visa, because it was issued in conjunction with his distinct and separate petition for permanent labor certification." (R. at 796.)  Upon review of the administrative record and the relevant federal regulations, the court concludes that the ARB's decision regarding the appropriate wage rate determination was not arbitrary and capricious and was supported by substantial evidence.

Under the H-1B temporary nonimmigrant worker program, an H-1B visa employee is entitled to the higher of the actual wage rate or the prevailing wage rate.  20 C.F.R. § 655.731(a). The prevailing wage rate for H-1B visa employment may be determined using a variety of methods, including a SWA-determined rate, an independent authoritative source, and "other legitimate sources."  *See* 20 C.F.R. § 655.731(a)(2)(ii).  When an H-1B visa holder files a complaint alleging that the employer has failed to meet the prevailing wage condition, as petitioner did here, the WHD "may contact ETA, which shall provide the Administrator [of the WHD] with the prevailing wage determination, which the Administrator shall use as the basis for determining violations and for computing back wages."  20 C.F.R. § 655.731(d)(1).  Here, the WHD determined that FAC had

25

used its own survey to determine the prevailing wage rate, found that the survey did not meet regulatory criteria, requested a prevailing wage determination from the ETA, and used that wage determination to assess back wages in the amount of $377.28. (R. at 278, 280.)

Entirely separate from the H-1B visa program, for which the ETA has authority to issue prevailing wage rate determinations upon the finding of a violation, is the employment certification process for permanent employment of aliens in the United States. *See* 20 C.F.R. § 656.2. Under the permanent employment program, a sponsoring employer can obtain a permanent residence visa for a foreign worker by (1) obtaining permanent employment certification from the Department of Labor, *see* 20 C.F.R. § 656.10, and then (2) applying for a permanent residence visa with USCIS, *see* 8 C.F.R. § 204.5(c). To apply for the permanent employment certification, the sponsoring employer "must request" a prevailing wage determination from "the SWA having jurisdiction over the area of intended employment." 20 C.F.R. § 656.40.[11] Thus, in contrast to the H-1B visa application process, the employer may not rely on any other sources of wage information to determine the prevailing

---

[11]    Prior to January 1, 2010, the SWA continued to receive and process prevailing wage determinations; on or after January 1, 2010, the NPC receives and processes prevailing wage determinations. 20 C.F.R. § 656.50(a). Here, FAC sought a prevailing wage determination for petitioner in the fall of 2006 (Resp't 56.1 Stmt. ¶ 6), and the wage determination thus fell under the SWA's authority.

wage rate for a permanent employment certification. *See id.*
Here, substantial evidence shows that FAC requested the SWA-
determined wage rate only in relation to the application for
permanent employment, and not for H-1B visa employment. (R. at
225, 230.)

Moreover, under the permanent employment program, a
foreign employee is not entitled to the SWA-determined wage rate
until he receives a permanent residency visa, commonly known as
a "green card," from USCIS.  On the Application for Permanent
Employment Certification, ETA Form 9089, the sponsoring employer
must attest to several conditions, including that the "offered
wage equals or exceeds the prevailing wage determined pursuant
to [20 C.F.R.] § 656.40" and that "the wage the employer *will*
pay to the alien to begin work will equal or exceed the
prevailing wage that is applicable at the time the alien begins
work or from the time the alien is admitted to take up the
certified employment."  20 C.F.R. § 656.10(c)(1) (emphasis
added).[12]  Although petitioner relies on this regulatory language
to argue that he was entitled to the SWA-determined prevailing
wage rate prior to receiving permanent employment certification
from the Department of Labor, the court finds his argument
unavailing.

---

[12]     ETA Form 9089, a copy of which is found in the record (R. at 229-40),
contains the same regulatory language.  The sponsoring employer must certify
that "[t]he offered wage equals or exceeds the prevailing wage and I will pay
at least the prevailing wage."  (R. at 237.)

Rather, an analysis of the regulations governing the permanent employment process reveals that a sponsoring employer need only show an *ability* to pay the SWA-determined prevailing wage rate during the permanent employment application process. Only after becoming a permanent resident is the employee entitled to the prevailing wage rate. *See, e.g.*, *In re Petitioner [Identifying Information Redacted by Agency]*, No. SRC 06 156 50478, 2008 WL 4051310, at *8 (Dep't of Homeland Sec. Apr. 7, 2008) ("[T]he petitioner[-employer] is legally obligated only to pay the prevailing wage once the beneficiary achieves permanent residency . . . ."); *Majdzadeh-Koohbanani v. Jaster-Quintanilla Dallas, LLP*, No. 09-CV-1951, 2010 WL 5677911, at *7 (N.D. Tex. Dec. 20, 2010) (citing 20 C.F.R. § 656.10(c)(1) and holding that the employer-defendant "was not legally obligated to pay Plaintiff the prevailing wage rate *until* he became a permanent resident" (emphasis added).)

FAC was in the process of sponsoring Baiju for permanent residence through employment at the time it terminated him. (*See* R. at 244, 11/8/07 Letter from Bhatia to de la Uz regarding I-140 Form ("After obtaining the labor certification, the next step is to apply petition for alien worker on Form I-140 to USCIS [sic].") To obtain permanent residency on behalf of a foreign employee, a sponsoring employer must submit Form I-140, Petition for Immigrant Worker, along with the Department of

Labor-issued labor certification, to USCIS for approval.   8

C.F.R. § 204.5(a).   Nowhere in the regulations is there a

requirement that the sponsoring employer must pay the foreign

worker the SWA-determined prevailing wage rate before permanent

residence is approved.   The regulations only require the

employer to show the *ability* to pay the proffered prevailing

wage rate until the I-140 petition is approved and permanent

residency is granted.

> Any petition filed by or for an employment-based
> immigrant which requires an offer of employment
> must be accompanied by evidence that the
> prospective United States employer has the
> *ability to pay the proffered wage*.   The
> petitioner must demonstrate this *ability* at the
> time the priority date is established[13] and
> continuing *until the beneficiary obtains lawful
> permanent residence*.

8 C.F.R. § 204.5(g)(2) (emphasis added).   USCIS, the agency

responsible for approving petitions for immigrant workers, has

clarified that there are three primary methods by which an

employer can establish its ability to pay the proffered

prevailing wage rate.   USCIS Memorandum, Determination of

Ability to Pay under 8 CFR 205.4(g)(2) (May 4, 2004) (rescinded

on other grounds), *available at* http://http://www.uscis.gov/

sites/default/files/files/nativedocuments/abilitytopay_4may04.pd

f.   An employer can show that its yearly net income exceeds the

---

[13]     The priority date is defined as the date the Department of Labor
accepted for processing the employer's request for labor certification.   8
C.F.R. § 204.5(d).

expected yearly wage; that its net assets exceed the expected
wage; or that it is already employing the foreign worker at a
wage equal to the prevailing wage rate specified on the labor
certification form.  *Id.; see also Taco Especial v. Napolitano*,
696 F. Supp. 2d 873, 878-79 (E.D. Mich. 2010) (summarizing three
methods).  Notably, paying the prevailing wage rate is only one
of the permissible methods and is not necessary to show the
employer's ability to pay.  Thus, according to the regulations
and USCIS, the sponsoring employer is only obligated to pay the
prevailing wage rate *after* the I-140 petition to hire the
foreign worker is approved by USCIS and the employee is granted
permanent residency; prior to that, the sponsoring employer need
only show an ability to pay the proffered SWA-determined wage
rate.

Here, there is substantial evidence showing that
petitioner's I-140 application for permanent employment
certification was never granted, and that it was in fact
withdrawn by FAC after petitioner's employment was terminated.
(R. at 21, 187-88, 288.)  Therefore, FAC was under no obligation
to pay Baiju the SWA-determined wage rate submitted with his I-
140 application.  Accordingly, Baiju's claim that he is entitled
to the SWA-determined wage rate for back pay under his H-1B visa
is without merit.  The ARB's decision upholding the ETA-
determined wage rate as the appropriate one for purposes of

30

calculating back pay was not arbitrary and capricious, is supported by substantial evidence and is consistent with the regulations, and is therefore affirmed.

### B.   Retaliation

Petitioner also argues that the ARB erroneously overlooked the evidence in determining that FAC did not retaliate against him when it terminated his employment. (Pet. at 16.)  The ARB found that petitioner engaged in protected activity when he complained to FAC and de la Uz that they were not paying him what he believed he was entitled to be paid under the H-1B visa program.  (R. at 799.)  Petitioner's "belief that he was entitled to more money was reasonable given that OSHA did find a violation upon investigation, even though he was not entitled to the wage listed on the New York [SWA] wage determination."  (R. at 799.)  Despite its finding of protected activity, however, the ARB ultimately agreed with the ALJ that petitioner "failed to show that FAC took adverse action against [him] because of his protected activity."  (R. at 799.)  Rather, the ARB found that FAC discharged petitioner because he refused to work, noting that despite petitioner's prior complaints about his pay, FAC's continued employment of petitioner and FAC's ongoing support of his permanent employment application

corroborated FAC's position that FAC did not discharge petitioner because of his complaints about pay.  (R. at 800.)

Pursuant to 20 C.F.R. § 655.801(a), no employer "shall . . . discharge or in any other manner discriminate against an [H-1B] employee" because the employee has disclosed information that the employee "reasonably believes evidences a violation of . . . the INA or any regulation relating to sections 212(n) or (t)."  20 C.F.R. § 655.801(a)(1).  H-1B retaliation claims are subject to the same "well-guided principles that have arisen under the various whistleblower protection statutes that have been administered by" the Department of Labor.  65 Fed. Reg. 80,178 (Dec. 20, 2000).  Thus, an H-1B visa holder must first make a *prima facie* case of retaliation by proving by a preponderance of evidence that he participated in a protected activity known to the defendant, the employer knew of the protected activity, there was an employment action disadvantaging the person engaged in the protected activity, and there was a causal connection between the protected activity and the adverse employment action.  *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 64 (2d Cir. 1992); *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2000).

If the plaintiff meets the burden of proving a *prima facie* case of retaliation, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory

reason for its actions. *Kotcher*, 957 F.3d at 64 (citing *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991)); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If the defendant meets its burden of articulating a permissible reason for its actions, then the burden shifts back to the plaintiff to show that the reason given was pretextual. *McDonnell Douglas*, 411 U.S. at 804-05.

Here, the ARB concluded that although petitioner engaged in protected activity when he complained about his wages, FAC articulated a legitimate and non-discriminatory reason for terminating petitioner, namely, that petitioner refused to perform his work duties. (R. at 799-800.) Upon review of the ARB's decision and the administrative record, the court finds that there is substantial evidence to support the ARB's determination that FAC did not retaliate against petitioner, and that this determination was not arbitrary, capricious, or contrary to law.

First, it was rational for the ARB to conclude that FAC had discharged petitioner due to his refusal to perform his work duties. De la Uz testified credibly, in the ALJ's view, that the manner in which petitioner demanded a higher wage had become disruptive for other staff members because he "was raising his voice and becoming aggressive." (R. at 203.) Petitioner's insistence on receiving the SWA-determined

33

prevailing wage rate culminated in a short email to de la Uz on February 6, 2008, asking, "When do you start paying me DOL DETERMINED RATE OF PAY?" (R. at 275.)  Later that day, de la Uz wrote an email to petitioner, explaining that demanding a salary increase in such a way was unprofessional and inappropriate, and suggested alternative ways for petitioner to advocate for higher salary. (R. at 277.)  The following day, February 7, 2008, petitioner refused to perform the duties he knew he was required to perform and which he had been performing until that date. (R. at 203.)  According to de la Uz, she first met with petitioner's supervisor to discuss petitioner's behavior. (R. at 204.)  She then met with petitioner and showed him a copy of his job description, and petitioner told her that he was unwilling to perform his duties. (R. at 204.)  De la Uz told him, "'Okay. Well, then we're going to need to terminate you,'" whereupon petitioner replied, "'You don't terminate me. I terminate you.'" (R. at 204.)

The ALJ found de la Uz's recollection of events to be credible and supported by the evidence, noting that at the hearing, petitioner "appeared reluctant to follow instructions or accept rulings that were opposite his position." (R. at 441.) The ALJ's credibility findings are entitled to great deference, *Pietrunti*, 119 F.3d at 1042, and this court will not disturb those credibility findings on review, especially given that the

34

transcript of the proceeding supports the ALJ's findings.  (*See, e.g.*, R. at 84, 112, 193-94, 208-09.)

Additionally, the termination letter stated petitioner was fired for "unprofessional behavior, including violations of FAC's Code of Conduct which resulted in breach of duty" (R. at 16), and the FAC Personnel Committee upheld the termination decision after reviewing petitioner's appeal request and his supporting documents.  (R. at 292.)  It is well-established that firing an employee because he or she is disruptive and refuses to obey instructions constitute legitimate, nondiscriminatory reasons for termination.  *See, e.g.*, *Thermidor v. Beth Israel Med. Ctr.*, 683 F. Supp. 403, 412 (S.D.N.Y. 1988) (holding that low productivity and conflicts with persons in positions of authority are legitimate reasons justifying discharge); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 178-79 (S.D.N.Y. 2011) ("[A]n employer may permissibly terminate an employee based on inappropriate comments, perceived insubordination, or disruptive behavior in the workplace."); *Gill v. Mount Sinai Hosp.*, 160 F. App'x 43, 43 (2d Cir. 2005) (holding that failure to complete job duties, inability to take direction, and confrontational and unprofessional behavior were legitimate, nondiscriminatory reasons to terminate employee); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) (holding that employer gave legitimate reasons for discharging employee where employee was

disruptive, clients had complained, and employee did not take supervisors' directions).  There is thus substantial evidence in the record to allow the ARB to rationally conclude that petitioner was terminated for a non-discriminatory and legitimate reason, namely, his refusal to perform his work and behave in a professional manner.

The ARB's determination is further supported by the evidence in the record showing that in the face of petitioner's repeated requests to be paid the SWA-determined wage rate prior to his termination date, FAC continued to sponsor his permanent employment application.  (R. at 187, 277.)  Petitioner testified before the ALJ that he had "time and again" raised the issue of his wage rate with de la Uz, the finance director, and other staff members of FAC.  (R. at 143, 160-61.)  De la Uz also testified that petitioner had demanded a higher wage several times. (R. at 202-03.)  Their testimony is corroborated by email correspondence between petitioner and de la Uz on February 6, 2008, in which de la Uz explained that she had "consistently" told him that his position did not have a $63,000 annual salary and that his permanent employment application had not yet been granted.[14]  (R. at 180, 277.)  Notably, de la Uz's email also

---

[14]     Petitioner also wrote an email on or about February 13, 2007, to the executive director of BWI. (R. at 247.)  Although the context of the email is difficult to discern from the excerpt provided in the administrative record, petitioner, in his testimony before the ALJ, represented that the email was

advises petitioner on alternative ways he could advocate for a pay increase, including informing him that the best time to request a salary increase would be during FAC's budget planning process to occur in a month's time.  (R. at 277.)

There is thus no indication in the record that FAC took any adverse action against petitioner for his repeated demands for a higher wage.  A "substantial time lapse" between an employee's protected activity and the employer's awareness of it and the adverse employment action is "counter-evidence of any causal connection between the two for purposes of a retaliatory action." *Cody v. Cnty. of Nassau*, 577 F. Supp. 2d 623, 645 (E.D.N.Y. 2008).  Here, the evidence shows that petitioner complained about his salary many times before the date of his discharge, and that far from reacting negatively to petitioner's repeated insistence on the SWA-determined higher wage, FAC continued to employ him in the same capacity, continued to sponsor his application for permanent employment certification, and de la Uz even advised him on how to seek a salary increase in a more professional manner.  Thus, given that petitioner had complained many times about what he believed to be his appropriate salary without incurring any adverse employment action, the court finds that the ARB rationally concluded that

---

related to his requests for what he believed to be the appropriate prevailing wage rate.  (*See* R. at 160.)

FAC's stated reason for termination was legitimate and nondiscriminatory.

Moreover, petitioner cannot carry his burden of showing that FAC's reason was pretextual. Petitioner cites the decision of the State of New York Unemployment Insurance Appeal Board as "smoking gun evidence of discrimination and retaliatory actions."[15] (Pet. at 17; R. at 273-74.) In the decision, the ALJ for the State of New York Unemployment Insurance Appeal Board ("Insurance Appeal Board") found that petitioner was discharged for complaining about his wage rate, and granted petitioner unemployment insurance benefits. (R. at 274.) To the extent that petitioner relies upon this unemployment insurance decision to establish his retaliation claim, however, he cannot succeed. First, the Insurance Appeal Board specifically noted that it made its findings based on a lack of sworn testimony from FAC, which did not appear at the hearing. (R. at 274

---

[15]   Petitioner cites *In the Matter of Radranath Talukdar and Harjinder Virdee*, No. 04-100, 2007 WL 352434 (Dep't of Labor Jan. 31, 2007), to support his claim of retaliation and request for reinstatement. (Pet. at 17.) *Talukdar* is distinguishable, because in that case, the ALJ found that the employer's stated budgetary reasons for ending Talukdar's and Virdee's employment were pretextual, given that the employer hired personnel during the same time period it discharged the prosecuting parties. (*Talukdar*, 2007 WL 352434, at *9-10.) Here, in contrast, petitioner is not able to point to any evidence showing that FAC's reasons for termination were pretextual.
   In addition, petitioner points to various documents in the record in an attempt to prove that he was discharged for complaining about his wages. (*See* Pet. at 17.) These documents, however, only show that petitioner is laboring under the fundamental misconception that he is entitled to the SWA-determined wage rate which was made with respect to the permanent employment certification. As discussed *supra*, petitioner was never granted permanent employment certification and thus was only entitled to the prevailing wage rate determined under the separate H-1B visa regulations.

(noting that "[h]earsay evidence cannot prevail against sworn
testimony when there is nothing in the record tending to impeach
the sworn testimony."))  Second, the Department of Labor's ALJ,
who had the benefit of hearing testimony and admitting evidence
from both parties, found by a preponderance of evidence that FAC
did not discharge petitioner due to his engaging in protected
activity.  (R. at 442.)  The Department's ALJ further noted that
because the circumstances regarding admissible evidence and
weight of the evidence were different in the two proceedings,
the Insurance Appeal Board's decision had little persuasive
value on the Department's decision. (R. at 442.)

It is well-established that the issues before a
Unemployment Insurance Appeal Board and the issues involved in a
retaliation or discrimination claim are entirely distinct.  The
former involves "whether an employee had engaged in misconduct
sufficient to disqualify [him] from receiving unemployment
benefits," while the latter concerns "whether [the employer] had
articulated a legitimate nondiscriminatory reason for
terminating . . . employment." *Liburd v. Bronx Lebanon Hosp.
Ctr.*, No. 07 Civ. 11316, 2009 WL 1605783, at *4 (S.D.N.Y. June
9, 2009).  Thus, a state unemployment insurance board's decision
has no preclusive effect on a later claim of retaliation or
employment discrimination.  *Hernandez v. N.Y.C. Law Dep't Corp.
Counsel*, No. 94 Civ. 9042, 1997 WL 27047, at *15-16 (S.D.N.Y.

Jan. 23, 1997) (collecting cases).  Petitioner's reliance on the
state Unemployment Insurance Appeal Board's decision regarding
his unemployment benefits, therefore, does not support his claim
that FAC retaliated against him.

Accordingly, this court finds that the ARB's
conclusion that FAC terminated petitioner for legitimate, non-
retaliatory reasons was supported by substantial evidence and
was not arbitrary and capricious, or otherwise not in accordance
with the law.

### C.   ARB's Denial of Requests for Reconsideration

Baiju also argues that the ARB improperly denied his
requests for reconsideration of its Decision.  Specifically,
petitioner argues that (1) the ALJ relied on "wrong law" to
determine the prevailing wage rate and issued her decision in
"mala fide"; (2) the ARB overlooked evidence of FAC's receipt of
the SWA-issued prevailing wage rate, which he asserts is
"reconfirmation" that he is entitled to back wages based on the
SWA wage rate; and (3) the ARB overlooked "20 CFR
655.731(a)(2)A(3)" and improperly calculating the back pay he is
owed.[16] (Pet. at 10-14.)

### 1.   ALJ's Decision

---

[16]    The regulation cited by petitioner does not exist.  Based on the text
that petitioner provides in his petitioner for review, it appears that the
correct regulation is 20 C.F.R. § 655.731(a)(2)(ii)(A)(3).

Petitioner argues that the ALJ incorrectly cited Title 20 C.F.R. § 656.10(c)(4) in deciding that it "provides that an employer is not required to pay the wage determination reported on a PERM labor certification until permanent residence is granted." (Pet. at 13-14; R. at 433.)  Petitioner asserts that "there is no such law in the United States." (Pet. at 14.)  20 C.F.R. § 656.10(c)(4) provides that in sponsoring an employee for permanent employment certification, the employer must certify various conditions of employment on its application, including that "[t]he employer will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States." 20 C.F.R. § 656.10(c)(4).

First, the court notes that the ALJ's decision is not properly before this court, because it is the ARB, and not the ALJ, that speaks for the Secretary of Labor for purposes of issuing final agency decisions that are subject to judicial review.  75 Fed. Reg. 3924 (Jan. 25, 2010).  Moreover, the ARB's decision did not rely on the disputed regulation to determine that petitioner was not entitled to the SWA-issued wage rate, issued for his permanent employment application, while he was only working under an H-1B visa.  Instead, the ARB affirmed the ALJ's decision as to the appropriate wage rate by noting that the SWA wage determination "bore no relationship to Baiju's wages under his H-1B visa, because it was issued in conjunction

with his distinct and separate petition for permanent labor certification." (R. at 796.)  As discussed *supra*, the ARB's determination regarding the appropriate wage rate was not arbitrary or capricious.  Accordingly, the ARB did not improperly deny petitioner's requests for reconsideration based on petitioner's disagreement with the ALJ decision.

### 2. ARB's Denial of Requests for Reconsideration

The ARB may grant a motion to reconsider a decision if the movant can demonstrate "(i) material differences in fact or law from that presented to a court of which the moving party could not have known through reasonable diligence, (ii) new material facts that occurred after the court's decision, (iii) a change in the law after the court's decision, and (iv) failure to consider material facts presented to the court before its decision." *Abdur-Rahman v. Dekalb Cnty.*, ARB Nos. 08-003, 10-074, 2011 WL 729637, at *2 (Dep't of Labor Feb. 16, 2011).  The district court reviews the ARB's denial of petitioner's motions for reconsideration to determine whether the denial was arbitrary, capricious, or an abuse of discretion. *See* 5 U.S.C. § 706(2)(A); *Patrickson v. U.S. Dep't of Labor*, 303 F. App'x 904, 907 (2d Cir. 2008).

Here, petitioner argues that in denying his requests for reconsideration, the ARB overlooked new evidence and ignored a controlling regulation.  Specifically, petitioner first

42

asserts that the ARB improperly denied his requests for
reconsideration in the face of new documents that he submitted
to the ARB, labeled "CX-24." (Pet. at 10-11.)  "CX-24" consists
of a copy of the SWA-issued prevailing wage determination that
petitioner obtained through a Freedom of Information Act
("FOIA") request. (R. at 715-16.)  The same SWA wage
determination appears twice more in the record, and notably, was
also submitted as evidence before the ALJ. (*See* R. at 223,
226.)  Accordingly, CX-24 is plainly not new evidence and the
ARB did not act arbitrarily or capriciously in rejecting
petitioner's request for reconsideration based on his claim of
"new evidence."

Second, the petition for review argues that the ARB
ignored 20 C.F.R. § 655.731(a)(2)(ii)(A)(3) in erroneously
determining the amount of back wages owed.  This regulation
provides that:

> In all situations where the employer obtains
> the PWD [prevailing wage determination] from
> the NPC [or, prior to January 1, 2010, the
> SWA], the Department will deem that PWD as
> correct as to the amount of wage.
> Nevertheless, the employer must maintain a
> copy of the NPC PWD.  A complaint alleging
> inaccuracy of an NPC PWD, in such cases,
> will not be investigated.

20 C.F.R. § 655.731(a)(2)(ii)(A)(3). According to petitioner,
this regulation shows that he deserves back wages based on the
SWA-determined prevailing wage rate. (Pet. at 12-13.)  As

43

already discussed, however, the SWA's prevailing wage rate was
issued in connection with the permanent employment application.
Petitioner was never granted permanent employment certification,
and only held an H-1B visa during his employment with FAC.
Under the H-1B visa program, the employer is permitted to use
several sources of wage information to determine the prevailing
wage rate for the H-1B visa position.  *See* 20 C.F.R. §
655.731(a)(2)(ii) ("The following prevailing wage sources may be
used...").  Although an employer may choose to request a wage
determination from the SWA for an H-1B visa application, it is
not required to do so.  Here, FAC chose to rely on its own wage
survey pursuant to 20 C.F.R. § 655.731(a)(2)(ii)(C), and
accordingly, the regulation petitioner cites, which applies only
when the employer has requested an SWA-issued wage determination
for the H-1B position, does not support his request for
reconsideration.

  As with the arguments for reconsideration presented in
his petition for review, Baiju's motions to reconsider that were
denied by the ARB similarly present no new issues of fact or law
to justify reconsideration.  As the ARB accurately noted in its
denial of reconsideration, petitioner simply repeated the same
arguments that he had made throughout the administrative
proceedings.  (R. at 851.)  Because the ARB "refuses to grant
motions for reconsideration that repeat arguments made on

appeal," *Abdur-Rahman*, 2011 WL 729637, at *3, the ARB correctly denied the motions for failing to identify a change in law or a material difference in law from that previously presented.

In his motions for reconsideration, petitioner also pointed to two additional exhibits, marked "CX-26" and "CX-28," in an attempt to justify reconsideration.   (R. at 731-36, 762-68.)   CX-26 consists of a cover letter from USCIS responding to petitioner's FOIA request; FAC's March 11, 2008 letter to USCIS notifying them that petitioner had been terminated (which had already been admitted into evidence before the ALJ (*see* R. at 284)); and FAC's May 1, 2006 letter to petitioner confirming his position as a staff accountant.   (R. at 731-36.)   CX-28 is an affidavit by de la Uz attesting to the steps she took to notify petitioner and USCIS about his termination.   (R. at 762-68.) Upon review of CX-26 and CX-28, the court finds that the documents neither present material new evidence nor provide any support for petitioner's claim that he deserves the SWA-issued wage rate in connection with his H-1B visa.   Accordingly, the court agrees with the ARB's decision to deny petitioner's requests for reconsideration.

Therefore, petitioner's claims that the ARB erroneously denied his requests for reconsideration based on a failure to consider new evidence and applicable law are

45

meritless.  The ARB's denial of reconsideration was not arbitrary and capricious, nor an abuse of discretion.

### D.   Involuntary Servitude

Finally, petitioner argues that FAC engaged in involuntary servitude by forcing him to work for two different companies.  (Pet. at 8.)  Specifically, petitioner claims that FAC "threatened me for asking the wages" and "forcefully engaged me in the work of other companies [BWI and Leap, Inc.] for their financial benefit," and eventually "threatened me physical harm and chased me out from my job."[17]  (Pet. at 8.)

As a threshold matter, the court notes that the ARB did not discuss any claim of involuntary servitude, and it is not even clear whether petitioner properly raised the claim before the ARB.  Petitioner made mention of involuntary servitude only once in his "Brief of Petition for de novo Review" submitted to the ARB, under the conclusion section. (*See* R. at 656-67.)  When the final agency decision fails to address a "potentially *meritorious* claim," the appropriate remedy is for the district court to remand the claim to the agency. *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 99 (D.D.C. 2009) (emphasis added) (remanding claim that was

---

[17]    Although petitioner names "BWI" (Brooklyn Workforce Innovations) and "Leap, Inc." as separate companies, Leap, Inc. is actually the formal name for BWI and is a wholly controlled affiliate of FAC. (R. at 176, 191, 228, 330.)

"sufficiently colorable to have warranted examination by the Administrator" but was not addressed by the final agency decision).  This is because if the agency has "entirely failed to consider an *important aspect* of the problem," the agency's decision is arbitrary and capricious and cannot be upheld on judicial review.  *Motor Vehicle Mftrs. Ass'n of U.S.*, 463 U.S. at 43 (emphasis added).

In this case, however, it was not arbitrary and capricious for the ARB to not discuss any claim of involuntary servitude because the ARB did not entirely fail to consider an important aspect of the problem.  Rather, petitioner's claim of involuntary servitude was not clearly raised before the ARB, and in any event, it is plainly meritless.  In his petition for review, petitioner cites 18 U.S.C. § 1584, which provides, "Whoever knowingly and willfully holds to involuntary servitude . . . any other person for any term . . . shall be fined under this title or imprisoned."  18 U.S.C. § 1584(a).  To prove involuntary servitude, there must be a "showing of compulsion." *Flood v. Kuhn*, 316 F. Supp. 271, 282 (S.D.N.Y. 1970).  "The term 'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the

legal process." *United States v. Kozminksi*, 487 U.S. 931, 952 (1988).

Here, there is no indication in the record that FAC threatened petitioner in any way to force him to continue working for it.  To the contrary, the record shows that petitioner desired to continue working for FAC as well as its affiliated organization, but only for a higher wage rate that he was not, despite his belief, legally entitled to be paid.  (R. at 173; Pet. at 17 (seeking reinstatement).)  De la Uz's February 6, 2008 email to petitioner even informed him that he was free to find other employment if he was not satisfied with his salary.  (R. at 277.)  Although petitioner may attempt to divine some sub-textual threat of deportation in the email because he was not legally authorized to work in the United States for any other employer, threats of deportation do not constitute holding an employee in involuntary servitude under 18 U.S.C. § 1584.  *United States v. Shackney*, 333 F.2d 475, 486–87 (2d Cir. 1964); *see also Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 540–41 (3d Cir. 2012) ("Absent some special circumstances, threats of deportation are insufficient to constitute involuntary servitude.")  Therefore, on these facts, there is no evidence to support a finding that FAC compelled petitioner to continue working for it by using physical or legal force, and to the extent petitioner raised a claim of

48

involuntary servitude before the ARB, it was not arbitrary and capricious for the ARB to fail to discuss the claim.

Even if the court were to find that the ARB's failure to discuss the involuntary servitude claim was arbitrary and capricious, the error was harmless and does not justify a remand to the agency for further explanation. *Bechtel*, 710 F.3d at 449 (noting that § 706 of the APA includes a harmless error test); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659-60 (2007) (no remand necessary where agency's error was harmless); *Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 337 (2d Cir. 2006) ("[A]n error does not require a remand if the remand would be pointless because it is clear the agency would adhere to its prior decision in the absence of error.")  Petitioner's allegation of involuntary servitude does not bear on the ARB's determination of the appropriate wage rate, retaliation, or any other legal issue in its decision, and thus any remand on the issue of involuntary servitude would not change the ARB's prior decision and "would be pointless." *Xiao Ji Chen*, 471 F.3d at 337.

Accordingly, petitioner's claim that FAC engaged in involuntary servitude is denied, and the court concludes that the ARB did not act arbitrarily or capriciously in failing to discuss the claim in its final decision.

**IV.  Petitioner's Motion to Certify Form I-918 is Denied**

49

Lastly, petitioner requests this court to certify Form I-918, Supplement B for his U-Visa application. (*See* ECF Nos. 79, 81.)  A federal judge that "has responsibility for the investigation or prosecution of a qualifying crime or criminal activity" may certify, by completing and signing Form I-918, Supplement B, that the U-Visa petitioner "has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim." 8 C.F.R. § 214.14(a)(2), (12); 8 U.S.C. § 1184(p)(1).  According to the regulations, "helpful" is meant to be interpreted broadly to include assistance at even the early stages of an investigation.[18]  72 Fed. Reg. 53,019 (Sept. 17, 2007).  To qualify as helpful, the alien seeking a U-Visa must possess credible and reliable information establishing that he has knowledge of the details concerning the qualifying criminal activity upon which the U-Visa petition is based, 8 C.F.R. § 214.14(b)(2), and must assist law enforcement authorities in the investigation or prosecution of the criminal activity, 72 Fed.

---

[18]    According to USCIS, the agency responsible for granting U-Visas and promulgating regulations, the helpfulness requirement is broad.

> The requirement was written with several verb tenses, recognizing that an alien may apply for U nonimmigrant status at different stages of the investigation or prosecution.  By allowing an individual to petitioner for U nonimmigrant status upon a showing that he or she may be helpful at some point in the future, USCIS believes that Congress intended for individuals to be eligible for U nonimmigrant status at the very early stages of an investigation.

72 Fed. Reg. 53,019.

Reg. 53,019.  Qualifying criminal activities include domestic violence, felonious assault, kidnapping, extortion, and "similar criminal activities" in which the nature and elements of the criminal offenses are substantially similar to the statutorily enumerated list of criminal activities.  8 C.F.R. § 214.14; § 1101(a)(15)(U)(iii).  Because judges are permitted to sign certifications but neither investigate crimes nor prosecute perpetrators, the regulations specify that "the term 'investigation or prosecution' should be interpreted broadly" to include the conviction and sentencing of the perpetrator.  72 Fed. Reg. 53,020.

Petitioner's request for certification states that he has been the victim of the crimes of perjury, involuntary servitude, and retaliation, all committed by FAC.  (*See* ECF No. 79, Ltr. Requesting Certification dated and filed 10/18/13 ("10/18/13 Ltr.") at 2-4.)  He states that he has been helpful by filing a petition for review in this court.  (10/18/13 Ltr. at 5.)  Notably, there have been no criminal investigations or prosecutions of the crimes that petitioner alleges FAC to have committed, nor does the record reflect any plans to initiate any criminal investigations or prosecutions.  (*See* ECF Nos. 24 and 59.)

The decision to sign a U-Visa certification form is discretionary.  *See, e.g.*, *Orosco v. Napolitano*, 598 F.3d 222,

226 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 389 (2010) (noting that satisfaction of statutory prerequisites does not automatically entitle applicant to certification); *Bejarano v. Homeland Sec. Dep't*, 300 F. App'x 651, 653 (11th Cir. 2008), *cert. denied*, 131 S. Ct. 389 (2010) (holding district court lacks subject matter jurisdiction over agency's discretionary decision to decline certification).  To the court's knowledge, there have been no cases in this circuit in which a federal judge has granted U-Visa certification to a party involved in a civil proceeding before the court.  The few district courts that have opined on when it would be appropriate for a judge to certify a U-Visa application are in disagreement.  *Compare Agaton v. Hospitality & Catering Services, Inc.*, No. 11-1716, 2013 WL 1282454 (W.D. La. Mar. 28, 2013) (denying certification because there was no pending investigation or prosecution of alleged crimes committed by employer), *with Garcia v. Audubon Communities Mgmt., LLC*, No. 08-1291, 2008 WL 1774584 (E.D. La. Apr. 15, 2008) (granting certification where plaintiffs made prima facie showing that they were victims of involuntary servitude), *and Villegas v. Metro. Gov't of Nashville*, 907 F. Supp. 2d 907 (M.D. Tenn. 2012) (citing *Garcia* and granting certification where plaintiff had previously won summary judgment and was awarded jury damages for defendant's violation of her constitutional rights).

This court finds the *Agaton* district court's reasoning to be more persuasive.  In *Agaton v. Hospitality & Catering Services, Inc.*, the United States District Court for the Western District of Louisiana denied the plaintiffs' motion for U-Visa certification because there was no pending investigation or prosecution of the alleged qualifying crimes.  No. 11-1716, 2013 WL 1282454, at *4 (W.D. La. Mar. 28, 2013).  The civil plaintiffs, who were before the court alleging that their employer violated the Fair Labor Standards Act, argued that the district judge should grant U-Visa certification because they were helpful in the investigation of the defendant-employer's alleged criminal activities, which included failing to pay wages and living expenses and threatening to deport the plaintiffs if they complained or left their positions.  *Id*. at *1.  The court disagreed, noted that there was no evidence of an ongoing criminal investigation or prosecution of the employer, nor was the court presiding over any criminal matter related to the defendant.  On these facts, the court denied the motion for U-Visa certification, because "[a]s this Court reads the regulations, they do not allow certification by a federal judge when that judge has no responsibilities regarding any pending investigation or prosecution of the qualifying crime."  *Id.* at *4.  The court observed that while the regulations state that the terms "helpful" and "investigation and prosecution" should

be interpreted broadly, the regulations nevertheless "still contemplate that *some* investigation or prosecution must have begun before certification." *Id.* (emphasis added). "[T]o read the regulations so broadly as to allow certification by a judge when that judge has no connection to any criminal prosecution or investigation involving the victims does violence to the rest of the regulatory language," which, on the court's reading, require a certifying judge to have at least some involvement in an ongoing investigation or prosecution of qualifying criminal activity. *Id.* at *4.

This court finds the *Agaton* district court's reasoning persuasive. Therefore, it declines to grant petitioner's motion for U-Visa certification because there is no evidence of any possible pending investigation or prosecution of the qualifying crimes that petitioner alleges. Moreover, even if the court were to follow the approach of the district courts in *Garcia* and *Villegas*, which granted U-Visa certification based on the plaintiffs' *prima facie* showing that defendants had engaged in qualifying criminal activities, the court would still decline certification here because petitioner fails to make a *prima facie* showing that FAC engaged in perjury, involuntary servitude, and retaliation.

Petitioner's U-Visa certification form first alleges that FAC committed perjury. Petitioner's interpretation of

54

documents in the trial record and his disagreement with the
credibility determination of the ALJ regarding the testimony of
FAC's executive director are insufficient to establish perjury.
As discussed *supra*, petitioner's claim that he was a victim of
involuntary servitude is not borne out by the record.  Second,
petitioner alleges that FAC and de la Uz committed perjury by,
*inter alia*, falsely attesting to the prevailing wage requirement
in the Application for Permanent Employment Certification, lying
about the appropriate wage rate that he was entitled to be paid,
and lying about performing an independent survey to determine
the prevailing wage rate for the H-1B visa position.[19]  (ECF No.
62, Pet'r Ltr. dated 5/27/13 and filed 5/28/13 at 6-9.)  As
already discussed, however, petitioner was not entitled to the
SWA-determined wage rate because he was never granted permanent
employment certification; FAC thus did not falsely attest to
paying petitioner the SWA-determined wage rate on its
application for permanent employment certification.  In
addition, there is more than sufficient evidence in the record

---

[19]     Petitioner also alleges that FAC and de la Uz committed perjury in a
host of other ways.  (*See* ECF No. 62, Pet'r Ltr. dated 5/27/13 and filed
5/28/13 at 5-9.)  Most of these claims seem to stem from petitioner's refusal
to acknowledge certain facts that have been established by the record.  For
example, petitioner claims that FAC perjured itself by telling him his
permanent labor application was not approved, when he believes it was
approved.  (*See id.* at 9.)  There is no evidence to support petitioner's
claim.  To the contrary, FAC wrote a letter to USCIS on March 11, 2008,
asking it to withdraw its petition for permanent employment certification.
(R. at 288.)
     Thus, to the extent that petitioner attempts to establish perjury by
simply disagreeing with the record, the court concludes that he cannot
succeed.

to support the ARB's finding that FAC performed its own survey in determining the prevailing wage rate for petitioner's H-1B visa employment.  Accordingly, petitioner is unable to make a *prima facie* showing that FAC committed perjury.  Third, petitioner claims that FAC retaliated against him when it discharged him.  The ARB found that petitioner's claim of retaliation was unsuccessful, and this court concluded that the ARB's decision was not arbitrary or capricious and was supported by substantial evidence.  As with his other claims, petitioner cannot make a *prima facie* showing that he was the victim of criminal retaliation.

Therefore, even assuming, *arguendo*, that a civil plaintiff's *prima facie* showing of a defendant's engagement in a qualifying criminal activity could be sufficient to merit U-Visa certification from a judge, petitioner still cannot meet that burden.  Petitioner's motion for U-Visa certification is accordingly denied.

## CONCLUSION

For the foregoing reasons, the court grants summary judgment to respondents Department of Labor and FAC affirming the final decision of the ARB and denies petitioner's motion for summary judgment.  The final decision of the ARB is affirmed, and Baiju's petition for review is denied.  In addition, petitioner's motion for U-Visa certification is denied.  The

56

court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).  The Clerk of Court is respectfully requested to enter judgment in favor of the respondents and close this case.  The Department of Labor is ordered to serve a copy of this Memorandum and Order on *pro se* petitioner and note service on the docket within two days of the date of this Memorandum and Order.

**SO ORDERED.**

Dated:      Brooklyn, New York
            January 31, 2014

                              _____/s/_____
                              **KIYO A. MATSUMOTO**
                              United States District Judge
                              Eastern District of New York